Opinion by
Head, J.,
When in 1894 the present plaintiffs bought the tract of land in dispute it was undoubtedly seated land. There were situate thereon a log house, barn and other buildings. A portion of the land had been cleared, fenced and put under cultivation. It was then and continued to be, down to and including the year 1900, regularly assessed as seated land, and the taxes levied were all paid by the owners until the present dispute arose as to the road tax for the year 1900. In that year, as in all the preceding years, the land was regularly assessed as seated land in the seated land list. It was therefore the duty of the county commissioners, the township school board, and the township supervisors to levy, under the said assessment, the various taxes which by law they were respectively authorized and required to levy and then to turn over to the township collector the various duplicates with the necessary warrants to empower him to proceed to collect the various taxes.
This record presents no question concerning any other tax for that year except the road tax. It does appear that the supervisors of the township had levied against this property in the name of the rightful owner a road tax of $1.50. John Scott, the then supervisor, either by mistake or in ignorance of his proper function, returned this tract of land as unseated land to the county treasurer because the road tax had not been paid to him. After the necessary period of time had elapsed the treasurer advertised for sale this tract of land, along with others, in the regular list of the unseated lands of the township and, at the sale that followed, sold it to the predecessor in title of the defendant who got into possession. The plaintiffs then brought this action of ejectment and on the trial the learned judge below directed a verdict for the plaintiffs upon which judgment was afterwards entered and this appeal followed.
It developed on the trial that the plaintiffs were a number of men, largely if not entirely engaged in the *179 railroad service as locomotive engineers or firemen, who had acquired this property for the purpose of obtaining a temporary home where they could spend their vacations in the spring and fall of each year fishing and hunting. They were not incorporated but assumed the name of “The Pittsburg Hunting Club,” and in that name took title to the property. They equipped the house with such simple furniture as would supply their necessities upon their recurring visits. In their absence it was turned over to the custody of one Snyder, the father of the defendant, to look after it, and in consideration of his services he was entitled to make such use of the land, either by way of cultivation or pasturage, as he might see fit. There can be no doubt, under the testimony, that during most of the years, if not during all of them, between 1894 and 1900, he raised more or less crops and vegetables on the portion he cultivated and made some use of the remainder to pasture cattle of his own or others. Such use, occupation and cultivation would of course be attributed to the plaintiffs whose servant he was.
■ It having thus appeared that the proper taxing power had determined for the year 1900, as well as in the preceding years, that this tract of land was seated land; that the owners acquiesced in the correctness of this determination; that it had never been assessed within the time covered by this record, as unseated land, and had not been so assessed for the year 1900, we think the learned trial judge was right in determining that it was not competent for the jury, on the trial of this case, to reach a conclusion different from the one arrived at by the assessor in whom was lodged the power and the duty of determining, at least in the first instance, the character of the land to be taxed as seated or unseated.
The act of the supervisor in returning to the treasurer this tract as unseated was wholly without warrant and equally without effect in changing its character. The land being therefore in fact and in law seated, a sale of it by the county treasurer as unseated, based merely on the *180 improvident return of the supervisor, would have passed ■no title had such sale occurred prior to the Act of June 3, 1885, P. L. 71. In Rooney v. Perry, a case reported in 7 Pa. District Reports, 373, that question was considered by our Brother Morrison, then presiding in the common pleas of McKean county. In his opinion he uses the following language: “Prior to the Act of June 3, 1885, P. L. 71, the law was well settled that such a sale would pass no title to the purchaser: Campbell v. Wilson, 1 Watts, 503; Biddle v. Noble, 68 Pa. 279, and cases therein cited; Skinner v. McAllister, 4 Cent. Repr. 750.” The converse of the proposition has also plainly been held in Holloway v. Jones, 143 Pa. 564. We quote the following from the language of Mr. Justice Green: “In the case of Hathaway v. Elsbree, 54 Pa. 498, followed by Preswick v. McGrew, 107 Pa. 43, we decided that a sale of land for taxes under the forty-first section of the Act of April 29, 1844, P. L. 486 as seated, which in point of fact was unseated, was a void sale, and passed no title to the purchaser. In the present case the plaintiff’s own testimony has established that the tract of land in controversy was sold as seated, and that at the time of the sale it was in fact unseated. As there was no conflicting testimony, the learned court below instructed the jury that the plaintiff had failed to show a title that gave him a right to a verdict. We are of opinion that this instruction was entirely correct.” It must follow therefore that unless the act of-1885 authorizes, or at least validates such a sale as that made by the county treasurer under the circumstances of this case, the purchaser at such sale took no title.
From the very beginning our law has clearly distinguished between seated and unseated lands-and by various statutes provided for the assessment and levy of taxes and their subsequent collection by different methods of procedure according as the land affected was in the one class or the other. It was, however, always recognized, both as a fact and a legal principle, that land once seated might thereafter become again unseated. The resident *181 of a seated tract might give up his residence, or the cultivator abandon what his toil had won from the forest, and when such facts were made to appear, an assessment of the land as unseated and its subsequent sale under the procedure applying to unseatéd lands was held to pass the title. With the law thus, there naturally arose many contests as to whether or not a tract assessed, returned and sold as unseated, was in point of fact seated land, or vice versa. The case last cited is an illustration of the situation that might arise under such conditions.
By the act of June 3, 1885, the legislature declared, “That all sales of seated or unseated lands within this Commonwealth which shall hereafter be made for arrearages of taxes due thereon, shall be held, deemed and taken to be valid and effective irrespective of the fact whether such lands were seated or unseated at the time of the assessment of such taxes,” etc. It is urged upon us that, under a proper construction of this act, although the tract of land now in dispute was in fact seated, was so officially declared to be by the assessor who assessed it in the seated list, and so recognized by the owners who, from year to year, had paid their taxes following such assessments; the sale by the treasurer of. this tract as unseated, based only on the return of the supervisor, would divest the title of the real owners and pass it to the purchaser at that sale. Such a construction of the act we are unable to adopt. The policy of the state to distinguish between the two classes into which the lands of the commonwealth naturally were divided, to provide entirely separate methods of procedure to enforce the payment of taxes assessed and levied upon the respective classes, had become part of the common knowledge and understanding of the people. It was not the purpose of the act of 1885 to unify the two classes or abolish the existing procedure to be followed in each case. The act furnished no new system of procedure. As in each of the old systems the assessment had been the first important step, the purpose of the new statute was to *182 declare that,- save in the single instance covered in its proviso, it should not be necessary or material to go behind the assessment and inquire into its correctness. That where land had been regularly assessed, either as seated or unseated, and where the procedure leading up to the sale was regular and followed the assessment, then the sale so made should be valid and effective, “irrespective of the fact whether such lands were seated or unseated at the time of the assessment;” in other words, irrespective of whether the assessor, in determining the status of the property made a mistake or not. That it did not intend that a tract could be suddenly shifted from its assessed class to the other, or be considered as in the one class quo ad county and school taxes, and in the other quo ad road taxes, becomes apparent when we construe the statute in the light of the Act of June 25, 1885, P. L. 187, enacted a few days later by the same legislature. The latter act provided for the election in all the boroughs and townships of the commonwealth of an officer to be known as tax collector, whose duty it was to collect from the various taxables of the borough, school district or township, all of the various taxes imposed, theretofore collected by the special officers of the various municipal divisions levying the taxes. But the twelfth section of that act expressly exempted from the powers and duties of such tax collectors unseated lands in the following language: “Taxes charged upon unseated lands shall not be collected by the collectors of taxes, but shall be certified and returned by the several authorities levying the same to the county commissioners to be collected as heretofore.”
The plaintiffs’ tract of land then, so far as this record shows, having been assessed as seated land, was fixed with that character for the payment at least of the county and school taxes which might be levied against it and they would be payable to the tax collector of the township. Is it possible that under these circumstances the supervisor could determine for himself that this tract of land was unseated as to the road taxes and return it to the *183 treasurer for sale under the laws applicable in such cases? If in point of fact the plaintiffs had paid the road taxes assessed upon this tract to the tax collector of the township, could it be contended that the treasurer’s sale with which we are dealing was of any validity whatever? It is to be remembered that although the tax laws of the state may present some incongruous features owing to the fact they are an evolution rather than a code, yet their purpose is merely to enforce the payment of taxes not to create pitfalls to catch a landowner with a resulting forfeiture of his property. “The acts authorizing sales of land by the commissioners or treasurer are laws for collection of taxes; not to sacrifice individual property as a forfeiture:” Jenks v. Wright, 61 Pa. 410. These considerations with others lead us to the conclusion reached by the learned trial judge, to wit, that the defendant showed no such title by virtue of the treasurer’s sale as would support a verdict against the legal title of the plaintiffs.
Having determined that the learned court below was right in his view that he was dealing with a seated tract of land, it follows that any limitation prescribed in the acts of April 3,1804,4 Sm. Laws 201, and March 13,1815, 6 Sm. Laws 299, relating exclusively to unseated lands, cannot be successfully invoked as a defense in this action: Simpson v. Meyers, 197 Pa. 522.
Judgment affirmed.